UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KAREN ENGEBRECHT,

                Plaintiff,             Case No. 12-11342
                                        Honorable Marianne Battani
          v.                 Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]**

Plaintiff Karen Engebrecht ("Engebrecht") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 15] which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [3].

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Engebrecht was not disabled under the Act is supported by substantial evidence of record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be GRANTED, that Engebrecht's Motion for Summary Judgment [12] be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On December 14, 2006, Engebrecht filed an application for DIB, alleging disability as of October 17, 1997.  (Tr. 111-14, 133).  The claim was denied initially on May 1, 2007.  (Tr. 84-89).  Thereafter, Engebrecht filed a timely request for an administrative hearing (Tr. 92), which was held on October 16, 2009, before ALJ Peter N. Dowd.  (Tr. 38).  Engebrecht, represented by attorney John Wildeboer, testified, as did vocational expert ("VE") Michele Robb.  (Tr. 44-82).  On January 15, 2010, the ALJ found Engebrecht not disabled.  (Tr. 20-37).  On January 24, 2012, the Appeals Council denied review.  (Tr. 1).  Engebrecht filed for judicial review of the final decision on March 26, 2012.  [1].

B.    **Background**

1.    *Disability Reports*

In a December 14, 2006 disability report, Engebrecht reported that her ability to work is limited by chronic depression and back pain.  (Tr. 143).  In particular, Engebrecht reported that work was "very stressful" for her:  she "would get anxious a lot"; had difficulty "remember[ing] things that [she] was to do" and "remember[ing] a lot of instructions if there was more than a couple of things to do," and "would get things mixed up and do something wrong"; struggled to "figure out which job had to be done first" when she had a number of jobs to do; "worried a lot about getting everything done in a short amount of time"; and struggled to manage her "own job . . . on top of the 3 or 4 additional huge jobs given" to her.  (Tr. 143).  Engebrecht also reported that she could not stand or sit for more than 3 to 4 hours without her back hurting very badly, and "[i]t was very hard to work when my back really hurt at work."  (Tr. 143).  Engebrecht indicated that her conditions first interfered with her ability to work in 1984, and that she became unable to

2

work as a result of them on October 17, 1997.  (Tr. 143).  A January 8, 2007 disability field office report indicated that Engebrecht had previously filed for DIB, a claim that was initially denied on December 1, 2001.  (Tr. 133).

As to treatment for her conditions, Engebrecht reported that she had been seeing a therapist, Deb Hastings, for counseling since 1994, and had been seeing Dr. Sachin Nagarkar since November 1993 for "[c]hronic depression" and "anxiety," explaining that she "was really depressed at work since my job was eliminated and I had to take another job which I knew would be stressful" and "had problems sleeping at night, too."  (Tr. 146).  Engebrecht reported two inpatient visits at "Bay Medical Center – Mental Health"—the first from June 26, 1996 to July 10, 1996, the second in the summer of 1998—as well as an outpatient visit in July 1996; during these visits, Engebrecht primarily saw Dr. Nagarkar and received medication and "lots of helpful information."  (Tr. 147).  Engebrecht reported that she was currently prescribed Paxil and Seroquel for her depression.  (Tr. 148).

As to her work history, Engebrecht reported that she worked as a "clerk-typist" in various Bay County departments from July 1981 through October 1997.  (Tr. 144, 151).  Engebrecht first worked as a Clerk-Typist II in the Bay County Finance Department from July 1, 1981 through December 30, 1990, where she typed letters and reports, entered and distributed purchase orders, answered the phone, made copies, opened and distributed mail, and prepared binders of reports.  (Tr. 151, 155). She then worked as a Clerk-Typist II in the Bay County Gypsy Moth Program from January 2, 1991 through October 22, 1993, where she performed data entry, printed reports, used maps to find various locations, answered the phone, made copies, and ordered supplies.  (Tr. 151, 154).  Engebrecht next worked as a Clerk-Typist I in the Bay County Nursing Department from October 25, 1993 through November 30, 1994, where she typed and filed

3

doctor's orders, filed and located charts, gave messages to nurses over the phone, made copies, and answered the phone. (Tr. 151-52). Engebrecht then worked as a Clerk-Typist II in the Bay County STD/HIV Program from December 1, 1994 through October 16, 1997, where she made clinic appointments, prepared forms, provided test results to patients over the phone and filed the results in the appropriate records, typed doctors' dictations, answered the phone, made copies, and ordered supplies and forms. (Tr. 151, 153).

In a January 27, 2007 work history report, Engebrecht additionally reported that, following her time with Bay County, her next employment came in November and December of 2003, when she worked as a receiving associate at Sears, unloading and opening boxes, putting items on racks, marking prices, and putting ink tags on clothing items. (Tr. 179, 185). She then worked part-time performing similar work as a receiving associate at Younkers from June 2004 to October 2004. (Tr. 179, 184). On a January 8, 2007 work activity report, Engebrecht indicated that she stopped working in both positions because of her "medical condition," but did not elaborate further. (Tr. 123, 137).

In a January 26, 2007 function report, Engebrecht reported that she lives alone in an apartment. (Tr. 167). Every day she makes her bed, gets dressed, takes care of and plays with her cat, watches television, tends to her email, prepares simple meals for herself, does the dishes, cleans her apartment as needed, takes a shower, brushes her teeth, and then goes to bed. (Tr. 167, 169). She reported no difficulty or need for assistance in caring for herself, her cat, or her apartment, or in handling her finances. (Tr. 168-70). She listed her hobbies as watching television, reading, and using her laptop, and indicated that there have been no changes in these activities since her conditions began. (Tr. 171). She goes outside by herself once or twice a day, shops for groceries and other essentials every two weeks, and drives. (Tr. 170). Once a month

4

or two, she goes to a movie with a friend, out to eat, or to her mother's house, and she goes to the mall twice a week to walk. (Tr. 171). She reported that she did not need to be reminded to go places, did not need someone to accompany her, and did not have any problems getting along with people. (Tr. 171-72). She indicated that no changes had occurred in her social activities since her conditions began. (Tr. 172). Engebrecht reported that her conditions affect her ability to lift, stand, and sit, as well as her memory, concentration, understanding, and ability to follow instructions. (Tr. 172). She explained that she "should only lift 20 lbs," that "sitting and standing will hurt my back after a couple of hours," and that her limitations in "memory, concentration, understanding and following instructions ha[ve] to do with being told to do 2 or 3 different things at once." (Tr. 172). She reported that she gets along well with authority figures, has never been dismissed from a job due to problems getting along with others, is not bothered by changes in routine, does not have any unusual behavior or fears, but gets "stressed out very easily." (Tr. 173).

In a subsequent 2007 disability report, Engebrecht reported that she had continued to see Dr. Nagarkar for anxiety and depression; she also reported that she had been seeing William N. Nicholson, Ph.D., since 1988 for the same. (Tr. 192). Engebrecht indicated that she continued to take Paxil and Seroquel, that her conditions do not affect her ability to care for her personal needs, and her daily activities had not changed since her last disability report. (Tr. 193). In a another report submitted in September 2009, Engebrecht reported further treatment with Dr. Nagarkar and Ms. Hastings, noting that they described her condition as "severe depression result[ing] in chronically low level of energy, inability to attend to multiple tasks, inability to deal with high anxiety level of clientele." (Tr. 196). She was being treated with Paxil and Seroquel, as well as Clonazepam. (Tr. 198). She also submitted work background and daily

5

activity sheets whose content was consistent with her prior reports.  (Tr. 197, 199-201).

    2.  *Plaintiff's Testimony*

   At the hearing before the ALJ, Engebrecht testified that she is a high school graduate and holds an associate's degree in business, which she obtained in 1978.  (Tr. 47-48).  She is single with no children, and lives by herself in her apartment.  (Tr. 46, 48).  She confirmed the course of her employment with Bay County, starting with the Finance Department, then moving to the Gypsy Moth Program and, upon the elimination of that position, to the Nursing Department.  (Tr. 49-50).  She stated that her position with the Nursing Department "got to me after a while" because it "was a pay cut" from her prior position and involved "doing so much that was so complicated," including "typing . . . nurses['] records of patients that they had seen and using all this medical terminology that I wasn't really that familiar with."  (Tr. 50).  After that position, she worked in Bay County's STD/HIV Program until October 17, 1997, when she left the position due to an incident two days prior.  (Tr. 51-52).  Engebrecht testified that, on that day, she had taken a break for a few minutes at the end of the clinic's appointment hours and came back to find a nurse in her office along with a woman who wanted to be tested and her three or four children.  (Tr. 53).  As Engebrecht recounted,

> the nurse was like saying, do this and do this and fill this out.  And do this and this and this and that and I couldn't remember that, you know.  So I started typing, I think I only got maybe one or two things right.  I started typing something and then one of the kids was making a lot of noise and that made me more frustrated.  And I couldn't concentrate and I told the lady, there's a waiting room down the hall, you're supposed to wait in there.  And she said, oh we're not doing that, we're waiting right here.  And then she got mad at me and I think she told the nurse that I was rude to her because I said that because I kind of wanted it quiet in my office so I could concentrate on what I was doing.  And that just really upset me.  And I thought they were going to fire me.

(Tr. 53-54).  Engebrecht saw Dr. Nagarkar shortly thereafter and decided to leave her position

and seek non-duty disability benefits from the county; she believes that she "probably" would have been fired had she returned to work.  (Tr. 54).  Engebrecht testified that she has received approximately $650 per month from the county in non-duty disability payments since that time. (Tr. 55).

Engebrecht then confirmed that she did stock work at Sears in November and December of 2003, a position which lasted only through the holiday season.  (Tr. 55-57).  She thereafter did similar work on a part-time, day-to-day "on call" basis with Younkers from June through October of 2004, when calls asking her to work ceased without explanation.  (Tr. 57).  She has not worked since.  (Tr. 57).

Engebrecht testified that she had been seeing Dr. Nagarkar "for a long time for mental problems," which she characterized as "[m]ajor depression" with the following symptoms:  "Sad all the time, I get frustrated and confused easily, things seem hopeless.  Sometimes I don't feel like doing anything, other times it is very hard to do things. And sometimes I get stressed out easily and I worry a lot."  (Tr. 58-59).  She testified that she worked for years with these symptoms and experienced some level of stress and worry in all her positions with the county, but became particularly stressed out later the 1990s.  (Tr. 59, 64).  She testified that, during her work in the Finance Department, "I got stressed out so much because I worked for a couple of different department head people" and "there were times when I had to do three or four big projects and they all had to be done at the same time"; "I got so frustrated some times, I couldn't even think straight."  (Tr. 61).  Engebrecht would seek her boss's help in managing these circumstances and then would be unable to sleep at night "trying to figure out what I should do first in the morning."  (Tr. 61).  She testified that she did not experience such difficulties to the same extent during her work for the Gypsy Moth Program.  (Tr. 64).  She testified that she did

not feel that she could have gone back to work for the county on a full-time basis at any point after she stopped both because of her back pain and because "I would have been stressed out wherever I went."  (Tr. 67).  She elaborated, "I would have been stressed out unless it would have – but they eliminated the Gypsy Moth Program there – there wasn't anything else suitable and I would have probably – I would have been stressed out no matter where I went working for those people."  (Tr. 67).

Engebrecht testified that the work she did for Sears and Younkers was "less stressful," but that "the job at Younkers was a little bit different than the one at Sears because the job at Sears, when I went into work . . . there were boxes in the area where I was working" and "I knew I could open up all those boxes"; at Younkers, on the other hand, only boxes with certain codes could be opened and "I didn't know that, so there were certain rules that – things I should have known but I didn't know because there were too many codes."  (Tr. 59-60).  She testified that this caused her stress and worry while doing her job, but not while she was not at work.  (Tr. 65).  She further testified that, at the time her supervisor stopped calling her to come in to work, she had not figured out the codes or how to do her job.  (Tr. 64).

Engebrecht testified that she decided to try the jobs at Sears and Younkers due to the determination in her prior application for disability benefits that she could do "substantial work," and that she "liked" and "thought she could do" her job at Sears, but grew frustrated when her "back problems started coming up again."  (Tr. 81).  She also testified that she did not appeal her prior denial of benefits in 2002 because she "was scared of . . . actually going to a hearing," "going in front of a judge or having to drive to . . . someplace else that I wasn't familiar with." (Tr. 62).  Upon Dr. Nagarkar's urging, however, she brought her current claim and retained an attorney.  (Tr. 62).

8

Engebrecht testified that the daily activities listed on her previously-submitted forms accurately reflect her typical day, that most of the activities she does are by herself, and that she does not often socialize with friends.   (Tr. 65-66).   Additionally, she testified that she rollerblades "[i]n summertime when the weather is nice," and that she used to attend a jazzercise class but stopped "about four or five years ago because our instructor had to quit."  (Tr. 71-72). She goes horseback riding once a week, which she has done for the past eight or nine years; she takes a one-hour class with other riders, which is held in either an indoor or outdoor ring, and has ridden three different horses over the course of those classes, though the instructor "tries to have me ride the same horse unless something's wrong with the horse."  (Tr. 72-74).  She testified that the riding also hurts her back.  (Tr. 81).

Engebrecht testified that her symptoms and her daily activities have remained the same since she stopped working in 1997, though "the last couple of years I really have been worrying a lot about running out of money, getting stressed out about that."  (Tr. 66).  She testified that changes in the pattern of her life do not cause her particular stress or anxiety, she does not particularly avoid change, and other than the then-recent death of her cat and an incident involving the theft of medications from her mailbox, she has not experienced any such changes or stressful events since she stopped working.  (Tr. 68-70).

3. *Medical Evidence*[1]

a. *Treating Sources*

i. *Dr. Sachin Nagarkar*

---

[1] The ALJ determined that, though Engebrecht "complain[ed] of back pain," "[t]he evidence does not indicate . . . that [she] had a 'severe' physical impairment of any sort during the time period under consideration."   (Tr. 27).   Engebrecht does not challenge that determination. Accordingly, the court summarizes here only the medical evidence pertinent to Engebrecht's mental conditions.

Engebrecht began receiving treatment from Dr. Sachin Nagarkar, a psychiatrist, on an outpatient basis in November 1993. (Tr. 284). With respect to the alleged period of disability in the present case, Engebrecht's first session with Dr. Nagarkar occurred on October 17, 1997, in which Dr. Nagarkar noted that Engebrecht "has been having a lot of problems at work" and "got a written reprimand," and that "[e]very time she goes back to work her problems get worse and worse and her depression gets worse and it causes a vicious cycle." (Tr. 360). Dr. Nagarkar recommended that Engebrecht consider "going for medical disability." (Tr. 360). In a subsequent session on November 26, 1997, Dr. Nagarkar again recommended she pursue "non-duty disability retirement," noting that Engebrecht stated that "she is going through a rough time," "cries every night," and "just can't face the prospect of going back to work." (Tr. 359).

In a November 26, 1997 letter to the Bay County Retirement Board of Trustees, Dr. Nagarkar noted that Engebrecht "has a history of chronic depression which has been resistant to treatment," that "[h]er illness has come to a point where she is having a hard time functioning at work," and that he has "strongly advised [her] to look into non-duty disability retirement." (Tr. 423). Dr. Nagarkar echoed these sentiments, and also expressed his opinion that Engebrecht was "totally and permanently disabled," in a December 23, 1997, letter to the Bay County Health Department. (Tr. 422). At some point before these letters, Dr. Nagarkar completed a Continued Disability or Work Release Form, in which he noted that Engebrecht suffered from recurrent major depression, explaining that "[s]he gets anxious and frustrated easily" and that a "large part of her difficulties at work—understanding instructions, remembering, interacting with others—are affecting her depression." (Tr. 424).

Engebrecht then saw Dr. Nagarkar on December 31, 1997, and he noted that the decision regarding her medical retirement was still pending and "there does not seem to be any change in

her depression," though "[s]he denies suicidal ideation."  (Tr. 359).  At her next session on February 4, 1998, however, Dr. Nagarkar noted that, for the first time, Engebrecht "actually sa[id] she is doing better" and "[t]here are some days where she feels really good," and "[p]art of the reason is that her worries about going back to her job are over."  (Tr. 358).  In sessions on March 17 and April 29, 1998, Engebrecht "state[d] that she is doing okay," but expressed disappointment about "not finding the kind of [apartment] she wants" and "be[ing] turned down by social security," and said "she just can't find it in herself to get a job."  (Tr. 358).  She and Dr. Nagarkar discussed alternatives, and also adjustments to her medications.  (Tr. 358).  Engebrecht next saw Dr. Nagarkar in July of 1998, and reported that she had found an apartment she liked and that her depression was "ok when she doesn't think about work or mom."  (Tr. 357).  In her next appointment on December 22, 1998, Dr. Nagarkar reported that Engebrecht "looks a lot more relaxed and hopeful," "she walks to the Bay City Mall, she watches TV, and goes to Jazzercise," and was "very excited about" her apartment; he further noted that "I do believe that the stress of her job contributed greatly to the depression."  (Tr. 357).  Engebrecht again stated that "she is doing okay" in an April 22, 1999 visit.  (Tr. 356).

On August 4, 1999, however, Engebrecht had an "emergency" session with Dr. Nagarkar and voluntarily admitted herself to his care on an in-patient basis at Bay Medical Center, complaining of "[i]ncreasing depression, anxiety and suicidal ideation."  (Tr. 249, 356).  Her admission was precipitated by an event approximately one week earlier at a water park that she frequents:  Engebrecht was at the park, a number of children were around, and "[t]here was a lot of screaming going on"; Engebrecht reported that this screaming "triggered severe anxiety and flashbacks" of "screaming that her brother would do when he was being physically abused by his father."  (Tr. 249; *also* Tr. 253, 260).  These flashbacks became so intense that they were "almost

11

audible" and triggered suicidal thoughts for Engebrecht, which persisted for a number of days along with anxiety and "severe insomnia with nightmares when she sleeps." (Tr. 249; also Tr. 254, 263). Dr. Nagarkar noted that Engebrecht "has anhedonia" and "has always been quite isolative in her social functioning, but feels even more so and there is a sense of estrangement with her mother." (Tr. 249). He also noted that "[s]he is awkward socially" and "is highly sensitive to criticism and tends to withdraw when she feels criticized." (Tr. 251). As to her treatment history, Dr. Nagarkar noted that "[h]er depression has been remarkably resistant" as "[s]he has been tried on almost every family of antidepressants," and that "this is a very severe personality disorder, complicated by a severe characterological depression which has generally been treatment resistant." (Tr. 246, 249). He also noted that she was previously admitted to Bay Medical three years prior "for depression and suicidal ideation." (Tr. 247, 250).[2] As to her work history, he noted that Engebrecht "use[d] to work in a secretarial job with the Bay County Health Department" but "[t]he stress at her work was a little too much for her" and she "has also had borderline intellectual functioning. We finally got her medical retirement and since then she has been functioning a lot better even though her finances are very tight. This apparent relapse has been quite recent." (Tr. 247, 250).

Dr. Nagarkar admitted Engebrecht with post traumatic stress disorder, dysthymia, and avoidant personality disorder, and noted that she had a moderate GAF. (Tr. 251). Engebrecht received medication and counseling during her stay at Bay Medical, and assessments taken throughout that time noted, *inter alia*, that Engebrecht had a history of childhood abuse and lacked family support; still had nightmares about the job she had two years ago with Bay County

---

[2] This admission was precipitated by a meeting with her supervisors at work in June 1996, during which, according to Engebrecht, she was "read a whole bunch of notes and pieces of paper from people who were making complaints about me"; Dr. Nagarkar noted that "[a]pparently most of the complaints were from Marilyn [her immediate supervisor] and the Lab." (Tr. 284).

and "felt paranoid all the time" during that work; and enjoyed inline skating, bike riding, walking, and jazzercise, "agree[ing] that she exercises excessively" because "it makes me feel good, I like it." (Tr. 254-74). On August 8, 1999, Dr. Nagarkar noted that "[o]n the whole both subjectively and objectively she seems a lot better," sleeping well and denying any suicidal ideation, audible thoughts, or feelings of hopelessness. (Tr. 252). She expressed concern about the cost of her stay, assured Dr. Nagarkar that "she is doing a lot better," and stated that would like to continue to work on "her issues . . . on an outpatient basis." (*Id.*). Engebrecht was discharged that day with a diagnosis of "Post traumatic stress disorder," "Comorbid dysthymia – characterological depression," and "Mixed personality disorder with avoidant and schizoid features," and was noted to possess a current GAF of "[a]round 65." (Tr. 248). She was instructed to continue counseling with Dr. Nagarkar and her therapist and to take her prescribed medication. (Tr. 248).

Engebrecht continued to see Dr. Nagarkar on an outpatient basis, and his treatment notes reflect four more sessions through the balance of 1999; two per year in 2000, 2001, and 2002; and one in 2003. (Tr. 350-55). Throughout this time, Engebrecht generally reported that she was doing "okay" though occasionally "could be better," was generally sleeping better at night, and was not experiencing any suicidal ideation; she continued treatment with medication, and reported that she was rollerblading, reading, watching television, doing jazzercise, and had taken up horseback riding in 2001. (Tr. 351-55). She particularly enjoyed her riding lessons and Dr. Nagarkar encouraged her to seek out part-time employment at the stable, but she never asked for a job there. (Tr. 351-52). Engebrecht periodically reported worries about her finances, and Dr. Nagarkar encouraged her to apply for assistance from the state and for disability benefits, but she was unsuccessful. (Tr. 350-54). Engebrecht also reported in an October 8, 2003, session, that

13

she was "barely" able to "make ends meet," was "actively looking" for a part-time job, and recently had a job interview with Target, but was "frustrated and disappointed with how she answered the questions." (Tr. 350).

The next treatment notes of record reflect four sessions with Dr. Nagarkar in 2007 and 2008, and indicate that Engebrecht was doing "okay," had been continuing her riding lessons, was looking for a job, and was waiting to hear regarding her application for DIB. (Tr. 418-21). In a letter dated October 19, 2009, and addressed "To whom it may concern," Dr. Nagarkar stated that Engebrecht "has a chronic depressive condition called dysthymia" and "also has borderline intellectual functioning," and that, in his "professional opinion she has been disabled from any occupation since April 3, 2003" and "[i]n fact, she has been disabled for a few years before that." (Tr. 440). And in an October 27, 2009 letter to Engebrecht's counsel, Dr. Nagarkar stated that he has been treating her for dysthymia, that he had "encouraged her to participate in rollerblading, jazzercise, and horseback riding" and "[o]n most days her participation is marginal," and that "[i]n my opinion she is permanently disabled and the above activities were therapeutic recommendations." (Tr. 441).

## ii.    Bay Psychological Associates

Engebrecht began receiving treatment at Bay Psychological Associates in September of 1987, and came under the care of therapist Deborah Hastings, M.A.L.L.P., on January 6, 1994. (Tr. 282, 430). The treatment notes of record indicate that Engebrecht received counseling from Ms. Hastings on a regular basis through at least 2007. (Tr. 306-44, 411-14, 438).

Engebrecht had sixteen sessions with Hastings between December 1997 through April 1998; Hastings characterized Engebrecht as "stable" and "open" throughout this period, sometimes noting that she was "down" or "discouraged" but also that she had "some good days."

14

(Tr. 335-44).  During this period, Hastings, along with fully licensed psychologist William N. Nicholson, prepared two letters regarding Engebrecht's condition in connection with her prior application for benefits.  In a letter dated February 3, 1998, Hastings and Dr. Nicholson noted that Engebrecht "has a long history of Chronic Dysthymia . . . with Recurrent Episodes of Major Depression"; "is depressed most of the time" and "has not responded to anti-depressant medication"; "is sad, discouraged, feels like a failure, and is self-critical"; "has suicidal ideation, is indecisive, has difficulty sleeping and has a poor appetite"; and "is fatigued and has a very low energy level" as well as "several physical health concerns, the most recent including myalgia and racing heartbeats."  (Tr. 282).  They observed that Engebrecht "has an avoidant personality style" and "has been resistant to pursuing friendships and has poorly developed social and interpersonal skills," and that, "[e]xcept for frequent rollerblading, aerobics twice weekly and an occasional concert, she has no social activity."  (Tr. 283).  They noted that Engebrecht "has had several different jobs in the time that I have known her" and "has experienced problems and received poor evaluations in each of them."  (Tr. 283).  They elaborated,

> She has very poor self-esteem, is easily intimidated, takes even minor criticism personally, is unassertive, gets easily confused and has difficulty following direction.  She was raised with impossibly high standards and has extreme difficulty with unrealistic expectations of herself.  She frequently assumes the worst about others' estimations of her.

(Tr. 283).  Lastly, they opined that Engebrecht's "emotional problems are characterological in nature and permanent in duration," and "that she is unable to fulfill the expectations of full-time employment and should be evaluated for disability."  (Tr. 283).

In a May 6, 1998 letter, Hastings and Dr. Nicholson noted that Engebrecht has a "chronically depressive personality," is prone to "all or nothing thinking," and "grasps the concept of replacing negative thinking with positive but is not successful in putting this into

15

practice." (Tr. 303). According to the letter, Engebrecht "believes she can't face working again," and Hastings and Dr. Nicholson opined that they "do not believe she will significantly recover. Life without work is such a struggle that I can't imagine her being successful in performing any *'significant work'*." (Tr. 303).

Hastings's treatment notes reflect eight sessions with Engebrecht between June and December of 1998, eighteen sessions in 1999, eight in 2000, and six in 2001. (Tr. 312-33). Hastings generally characterized Engebrecht as "stable" and "open" during this period, and sometimes as "upbeat," "bubbly," or "relaxed," and reported that she was "staying busy" with activities such as rollerblading, going to the waterpark, and taking weekly horseback riding lessons; the notes, however, also reflect periodic depression and anxiety regarding Engebrecht's finances and family relationships, as well as the circumstances surrounding Engebrecht's August 1998 in-patient treatment at Bay Medical. (Tr. 312-33).

On January 28, 2002, Hastings and Dr. Nicholson prepared a letter in connection with the denial of Engebrecht's prior application for benefits. They again noted that Engebrecht suffers from "chronic Dysthymia . . . that is characterological in nature and no doubt permanent in duration," and that "[b]i-monthy sessions for supportive maintenance and psychotropic medication allow her to live a quiet, simple life." (Tr. 280). They observed that Engebrecht's "interests and activities" include "two goldfish, potted plants, rollerblading, biking, jazzercise, and riding lessons on a horse named Rambler," but that "she has an avoidant personality and has no close, personal attachments outside her immediate family"; furthermore, "[h]er mother and brother, who live here in town, offer little emotional support," and "[s]he is closer to a sister in Ohio but sees her only 2-3 times yearly." (Tr. 280). As to employment, they stated,

> Ms. Engebrecht constantly worries about money and lives with the fear
> that she will be forced to try to find a job to make ends meet when her car

16

has to be replaced and she has a car payment again.  However, she does not do well in work environments because there are people there she has to deal with.  Supervisors and clients alike rattle her.  She gets nervous and confused and does poorly.  I do not believe she is capable of performing significant work—either full-time or part-time—and do not expect that to change in the future.

(Tr. 280).

Hastings's treatment notes indicate that she had sessions with Engebrecht approximately once every two to three months in 2002 and 2003.  (Tr. 306-12).  These notes characterize Engebrecht as "stable" and "open"; discuss her continued interest in riding horses (including that she "enjoy[ed] riding a new horse"), rollerblading, and biking; and indicate that she had begun "[a]ctively seeking part-time employment" to address her financial concerns, ultimately securing a stock-clerk position at Sears.  (Tr. 306-12).

On April 6, 2009, Hastings completed a Medical Provider's Assessment of Ability to Do Mental Work-Related Activities regarding Engebrecht.  (Tr. 428-32).  She indicated that Engebrecht was: (1) mildly limited in her ability to understand, remember, and carry out simple job instructions, and to behave in an emotionally stable manner; (2) moderately limited in her ability to function independently, to maintain her personal appearance, and to maintain concentration, persistence, or pace; (3) moderately to markedly limited in her ability to relate to co-workers, use judgment, and maintain attention or concentration; (4) markedly limited in her ability to deal with the public, to interact with supervisors, to relate predictably in social situations, to maintain social functioning, and to understand, remember, and carry out detailed but not complex job instructions; (5) markedly to extremely limited in her ability to follow work rules; and (6) extremely limited in her ability to deal with work stresses, and to understand, remember, and carry out complex job instructions.  (Tr. 428-29).  Hastings reported that these limitations have been present since 1987.  (*Id.*).  She also reported no limitations in Engebrecht's

17

daily activities or her ability to demonstrate reliability.   (Tr. 429).   Hastings explained that Engebrecht has not worked full-time since October of 1997 and has "struggle[d] in her various work environments through the years," noting that "there has been at least one complaint in each position" she held.   (Tr. 430).   She also noted that Engebrecht "has had two psychiatric hospitalizations," "remains in treatment for 'supportive maintenance'" every three months, and "takes psychotropic medication."   (Tr. 430).   She opined that Engebrecht suffers from "chronic Dysthymia . . . that is characterological in nature and permanent in duration," "has a high degree of social anxiety if out of her element," and is not "capable of employment."   (Tr. 430).

Hastings reiterated this diagnosis and opinion in an October 26, 2009 letter, and stated that Engebrecht "leads a quiet, simple life with few demands" but "[w]hen that life becomes complicated by things outside her control, she tends to get depressed and anxious."   (Tr. 215). Hastings stated that "[s]taying physically active is an important part of her regimen," noting that Engebrecht rides her bike, rollerblades, rides horses, and sometimes exercises to videos at home. (*Id.*).   She opined that, since Engebrecht's last full-time job ended in October of 1997, Engebrecht "has been disabled and incapable of significant (sustained, full-time) employment" and, "[a]lthough she has had some temporary, part-time jobs since then, she had always struggled in the work environment, either physically or emotionally."   (*Id.*).   Hastings noted that Engebrecht experienced back pain during her part-time work for Sears and Younkers and that "she worried for 24 hours before her performance evaluation" at Younkers; she thought, however, that the evaluation "went well" and "still doesn't know" why she was not called back for further work there.   (*Id.*).   Hastings further opined that, due to Engebrecht's depressive and avoidant personality, "I do not believe that [she] will ever be able to function in the workplace." (*Id.*).   In particular, she noted that Engebrecht "is easily intimidated by supervisors, co-workers

18

and clients/customers alike" and "is very sensitive to criticism and lacks the self-confidence it takes to ask for clarification if she doesn't understand what is expected of her"; "[c]onsequently, she makes mistakes and feels overwhelmed," and "then has even more difficulty maintaining concentration and the pace that is expected of her." (*Id.*).

                *b.*      *Consultative and Non-Examining Sources*

                *i.*      *Dr. Robert Plummer*

Psychologist Robert Plummer evaluated Engebrecht on March 21, 1998, in connection with her prior application for benefits. (Tr. 228-34). He noted that, during the evaluation, she was "fully cooperative, making [her] best effort, appeared to be highly motivated," and that she was "friendly, responsive and expressive, but also anxious, fearful and somewhat timid." (Tr. 231-32). He observed that she was on time for the examination, drove herself and had "no trouble finding the exam location," "spoke in a clear voice with frequent eye contact," and her speech and manner of relating to him were "appropriate." (Tr. 231). Engebrecht told Dr. Plummer that she was applying for disability "because now I don't know what work I can do, and the last job I had was very frustrating." (Tr. 228). She then discussed the incident that occurred in October 1997 while she was working in the Bay County HIV/STD Program, growing upset as she explained that "I had six people in my office, and I had to take care of them all at once," "I had to not make one mistake and God knows I tried . . . [b]ut I would make a mistake," and then "[t]hey got after me, the nurse and the supervisor and the personnel office, and they would make a big deal about it, and I forgot to lock the file cabinet one time, and it really hurt me how they came after me about that," and "I was afraid they would fire me, so I went on leave, but I know that I could not go back there." (Tr. 228). Engebrecht also stated that when she was at work, "I would beat myself up. I could not have done anything any better at work. I don't

know why they kept after me and kept after me." (Tr. 231).   Dr. Plummer reported that Engebrecht told "stories about other jobs she had in the past, which ended in the same sort of fashion." (Tr. 228).

Dr. Plummer noted that Engebrecht was being treated by Dr. Nagarkar; was taking Paxil and Remeron, which she said "helps her"; and was getting psychotherapy once every two weeks at Bay Psychological Associates.   (Tr. 228-29).   Engebrecht also stated that she had been hospitalized at Bay Medical Center two years prior for a "nervous breakdown," but when asked to elaborate, grew upset and could not remember why she was in the hospital:  "All I remember is that personnel director reading all of these things that I was doing wrong, and I thought that they would fire me."   (Tr. 229).   Engebrecht reported that she gets along with her family, neighbors, co-workers, and bosses, but noted that "I hated the nurse [in my prior job].  I could not stand to be around her because of what she said to me.  She would really hurt me.  She gave me all these problems, but the other nurses treated me nicely, and I got along with them pretty well."  (Tr. 230).   Engebrecht reported that she had always received "really good" grades and does not recall ever getting in significant trouble at school.  (Tr. 229).

Engebrecht told Dr. Plummer that she enjoys going to her jazzercise class twice a week, going for walks, and horseback riding.  (Tr. 230).  She stated that her only friends were her jazzercise classmates, though they did not socialize outside of the class.  (Tr. 230).  She lives alone and, in addition to these activities, spends her typical day watching television, listening to the radio, and doing household chores; she can drive, does not need help with chores or cooking, and handles her own finances.  (Tr. 230-31, 233).  She worries a lot, particularly about finances, and "fears that she cannot control herself," but Dr. Plummer noted that "[t]his is just her own perception of her fears" and "in fact, she can control herself very well."  (Tr. 231-32).

20

Dr. Plummer diagnosed Engebrecht with "Dysthymia – chronic"; "Major Depressive Disorder, recurrent, moderate severity without psychotic features"; "Borderline Intellectual Functioning"; and "Personality Disorder not otherwise specified with both avoidant and dependent features." (Tr. 234). He noted that her "[p]sychosocial stressors" were financial and occupational; that she achieved a Verbal IQ Score of 81, a Performance IQ score of 72, and a Full Scale IQ score of 75; and that she possessed a current GAF of 45 to 55 with no suicidal ideation. (Tr. 233-34). He indicated that her prognosis was poor, explaining that she "has a great difficulty with on-the-job performance and performing within time limits," and that she

> has a great deal of difficulty in interpreting appropriately social cues and conventions and responding with appropriate conventional behaviors in addition to not being able to separate relevant from irrelevant details in a situation to arrive at a logical conclusion. She needs a great deal of time in assembling simple items and so if she's going to be working on any kind of occupational functioning, she's going to need not only a great deal of time to respond appropriately to the job tasks but also a great deal of support and encouragement from supervisors and coworkers.
>
> . . . .
>
> . . . . [H]er supervisors and tasks would have to be commensurate with her current abilities in order to achieve any kind of positive prognosis for her, and her coworkers and supervisors would have to be sensitive to her anxiety and low sense of self esteem as well as sensitivity to being criticized in order to achieve a positive prognosis for her.

(*Id.*).

### ii.    *Dr. Ron Marshall*

On April 24, 2007, state agency psychologist Ron Marshall, Ph.D., prepared two records-based psychological assessments of Engebrecht: a Psychiatric Review Technique (Tr. 382-95), and a Mental Residual Functional Capacity Assessment (Tr. 396-99). These assessments were based on the time period relevant to her current application for benefits (i.e., October 17, 1997 through December 31, 2003). (Tr. 382, 396). Dr. Marshall reported that Engebrecht suffered

21

from borderline intellectual functioning, dysthymia, major depressive disorder, and a personality disorder not otherwise specified.  (Tr. 383-89).  He indicated that Engebrecht had experienced no episodes of decompensation of extended duration; had mild limitations in her activities of daily living and in her ability to maintain social functioning; and had moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 392).

As to her mental residual functional capacity, Dr. Marshall indicated that Engebrecht was not significantly limited in her ability to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; or to set realistic goals or make plans independently of others.  (Tr. 396-97).  He indicated that Engebrecht was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to respond appropriately to changes in the work setting; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 396-97).

### 4.    *Vocational Expert's Testimony*

At the hearing before the ALJ, the VE testified that Engebrecht's work as a clerk-typist for Bay County was semi-skilled labor at both the light and sedentary levels, and that her work for Sears and Younkers as a stock clerk was unskilled labor at the light level.  (Tr. 76).  The VE testified that this past work could not be performed by a hypothetical individual of Engebrecht's age, education, and work history as of December 31, 2003, who could maximally lift weights of 50 pounds; could repetitively lift weights of 25 pounds or less; could stand and walk for at least six of eight hours in an eight-hour workday; could sit for at least six of eight hours in an eight-hour workday; could, from a mental standpoint, do simple, routine, and repetitive work activities in a stable work environment; and could maximally tolerate superficial contacts with supervisors and co-workers but could not work with the general public.  (Tr. 77).  The VE confirmed that this included the past work as a stock clerk because generally such clerks "will have to go out on the floor periodically and perhaps deal with customers."  (Tr. 77).

The VE then testified that, as of December 31, 2003, there would have been a significant number jobs that such a hypothetical individual could perform in the lower peninsula of Michigan:  namely, "at the medium, unskilled level, there would be dishwasher," and at the "light, unskilled level . . . there would be assembler" and "inspector."  (Tr. 78-79).  The VE confirmed that these jobs would "involve minimal contacts if any with the general public and . . . only superficial contacts with supervisors or co-workers," and that "they would be classified as low stress" because "[t]hey're not jobs that are going to involve a lot of change or conflict or confrontation."  (Tr. 79).  The VE further testified that the hypothetical individual could not perform any work in the national economy if that individual, "because of a diagnosis of disseminating and major depressive disorder," had "extreme limitations in dealing with work

23

stress" such that she could not "do any gainful activity" – i.e., if she had a "mental impairment of

listings level severity."  (Tr. 80).

### C.      Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.

Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if
> other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec.

6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four

24

steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled,

the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d

1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Engebrecht not disabled under

the Act.  The ALJ first found that Engebrecht last met the insured status requirements of the Act

on December 31, 2003, and had not engaged in substantial gainful activity from October 17,

1997 through that date.  (Tr. 25).  At Step Two of the analysis, the ALJ found that, through the

date last insured, Engebrecht had the following severe impairments:  dysthymia with recurrent

depression; borderline intellectual function; and personality disorder with avoidant features.  (Tr.

25-27).  At Step Three, the ALJ found that Engebrecht's impairments, considered alone or in

combination, did not meet or medically equal any of the applicable listed impairments in the

regulations.  (Tr. 27-29).

The ALJ then assessed Engebrecht's residual functional capacity ("RFC"), concluding

that, through the date last insured, she was capable of performing a full range of work at all

exertional levels but with the following nonexertional limitations:  she was limited to simple,

routine and repetitive work activities performed in a stable, low-stress environment; and she was

maximally limited to superficial contact with supervisors and coworkers, and should not work

with the general public.  (Tr. 29-32).

At Step Four, the ALJ determined that through the date last insured, Engebrecht was

unable to perform her past relevant clerical work, in light of the VE's testimony to that effect.

(Tr. 32).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that through the

date last insured, Engebrecht was capable of performing jobs that existed in significant numbers

25

in the regional economy.  (Tr. 33-34).  Accordingly, the ALJ concluded that Engebrecht was not disabled under the Act.  (Tr. 34).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (quotation marks omitted); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that

either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See*

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can

consider all evidence without directly addressing in his written decision every piece of evidence

submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is

supported by substantial evidence, "it must be affirmed even if the reviewing court would decide

the matter differently and even if substantial evidence also supports the opposite conclusion."

*Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

    **F.**    **Analysis**

Engebrecht takes issue with multiple aspects of the ALJ's assessment of her residual

functional capacity:  namely, that he (1) improperly assessed her prior work experiences as they

relate to her impairments and ability to work; (2) failed to afford proper weight to the opinions of

her treating sources; and (3) failed to fully account for the findings of consulting examiner Dr.

Plummer.  As set forth below, the court disagrees, and finds that substantial evidence supports

the ALJ's decision.

    *1.*    *The ALJ Properly Assessed Engebrecht's Prior Work Experiences and Incorporated Them into His RFC Assessment*

Engebrecht first contends that the ALJ, in assessing her RFC, erred by concluding that

her "psychiatric impairments were limited to [her] last work" as a clerk-typist in the Bay County

STD/HIV Program.  [12 at 6].  Engebrecht focuses this argument on two passages from the

ALJ's assessment.  First, the ALJ observed that he

> does not doubt that, in the claimant's last job which ended at the alleged
> onset date, the claimant experienced serious emotional distress which
> prevented her from returning to that work.  The experience appears to
> have been even traumatic in its effect.   However, the claimant's
> difficulties with this prior semi-skilled work appear to have been relatively

27

> specific: she was under significant stress performing complex and multiple tasks with specific goals in an environment involving close contact with supervisors and coworkers.

(Tr. 31).  Similarly, the ALJ later observed that he "agree[d]" with Engebrecht's treating sources that Engebrecht "has significant mental difficulties with work-related activity," but that "these difficulties appear to have manifested most starkly, and almost exclusively, in the context of a high-stress job which required significant interactions with less than sympathetic coworkers and supervisors."  (Tr. 32).

According to Engebrecht, "[t]here is no evidence of any nature to support the findings in the ALJ Decision that [her] last job was 'traumatic,' presented 'significant stress,' or involved 'complex and multiple tasks' o[r] involved 'close contact with supervisors and coworkers' to any different degree presented in any clerk typist position."  [12 at 8 (citations omitted); *also* 12 at 6, 9, 10, 12].  Because "[t]here was no evidence to support the finding in the ALJ Decision that [Engebrecht]'s job was distinguishable in any way from any other clerk typist position," Engebrecht argues, the ALJ, "having found [Engebrecht] incapable of performing a standard clerk typist position due to [her] psychiatric impairments, . . . was bound to find that [her] limitations prevented her from engaging in any substantial gainful activity."  [12 at 13].

The court sees no merit in this position.  First, Engebrecht mischaracterizes the ALJ's assessment.  The ALJ did not conclude that Engebrecht's limitations only precluded her from returning to her prior job as a clerk-typist in the Bay County STD/HIV Program—or, for that matter, in any of the other county departments in which she previously worked.  Rather, upon review of the record, the ALJ agreed with Engebrecht and her treating sources that she "could not return to this past job, or a job which involved similar duties," but concluded that she "could perform work which was not so mentally demanding as her previously semi-skilled work,"

explaining that "[t]he mental limitations noted in the . . . RFC are an attempt to fashion the requirements of such work."  (Tr. 31).[3]  The ALJ then concluded, based on this RFC and the testimony of the VE, that Engebrecht could have performed jobs that existed in significant numbers in the regional economy during the relevant time period, such as dishwasher, assembler, and inspector (Tr. 33)—jobs that were all at the unskilled level, unlike her prior semi-skilled work as a clerk-typist, and that would "involve minimal contacts if any with the general public," "only superficial contacts with supervisors or co-workers," and "low stress" in that "[t]hey're not . . . going to involve a lot of change or conflict or confrontation."  (Tr. 78-79).

Accordingly, even if Engebrecht's prior work as a clerk-typist was not "distinguishable" from that of a typical clerk-typist [12 at 13], this fact is of no consequence here, as the ALJ concluded that she "could not return to this past job, or a job which involved similar duties." (Tr. 32).  It certainly does not follow from this conclusion that the ALJ was then "bound to find that [Engebrecht]'s limitations prevented her from engaging in *any* substantial gainful activity." [12 at 13 (emphasis added)].  Indeed, he found that she could perform different, unskilled work that met the RFC's other restrictions—a determination, as discussed at greater length below, that is supported by substantial evidence.

Furthermore, the record supports the ALJ's characterization of Engebrecht's experiences and difficulties with her prior work.  Engebrecht's struggles in the HIV/STD Program were at

---

[3] Namely, the ALJ explained that the RFC limits Engebrecht to "simple, routine and repetitive work tasks, to in contrast to the semi-skilled work she performed in her previous job," to accommodate her borderline intellectual functioning; to "typically low-stress work performed in a stable work environment (again, uncharacteristic of her previous work)," to accommodate her "significant problems with frustration and stress management in volatile work environments or when required to perform multiple tasks"; and to "no more than superficial interaction with supervisors and coworkers, with no significant contact with the general public," to accommodate her "low self-esteem, sensitivity to criticism and baseline difficulties with social interaction" and her "problems with getting along with others in [a] work-setting" as well as to "further reduce the risk of increased stress."  (Tr. 32).

times very intense, resulting in a period of hospitalization and, a few months later, retirement; she continued to have nightmares about that job nearly two years after retiring.  (Tr. 265, 355). As to the sources of these struggles, Engebrecht reported particular difficulty with a certain nurse in that office who "really hurt" her and "gave [her] all these problems" (Tr. 230); her hospitalization was precipitated by a negative performance review involving a high volume of criticism from her immediate supervisor (Tr. 284); and her subsequent retirement was precipitated by a stressful event in which she, at an unexpected time, was ordered by a nurse to perform multiple tasks at once while surrounded by multiple individuals in her office (Tr. 53-54, 228).  Similarly, in her prior work in the Finance Department, Engebrecht reported that she experienced particular stress when asked to handle multiple large projects for different people at the same time and in short order.  (Tr. 61).  She also expressed frustration with the complexity of aspects of her work in the Nursing Department, such as the use of medical terminology with which she was not familiar.  (Tr. 50).  She indicated, however, that her work as a clerk-typist in the Gypsy Moth Program was not marked by the same level of difficulties that she experienced in these other departments.  (Tr. 64, 67).  This evidence corresponds with the ALJ's description of the circumstances under which Engebrecht's conditions created significant difficulties in her work as a clerk-typist, and the court sees no error in the ALJ's use of this evidence to inform his RFC assessment of Engebrecht.

> 2. *The ALJ Properly Weighed the Opinions of Engebrecht's Treating Sources in His RFC Assessment*

Engebrecht next contends that the ALJ "erred in failing to give controlling weight to the opinions of [her] treating psychiatrist Dr. Nagarkar, [her] treating psychologist Dr. Nicholson,

and [her] treating therapist Ms. Hastings." [12 at 13].[4]  An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 20 C.F.R. § 404.1527(c)(2).  The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion.  *Blakley*, 581 F.3d at 406-07; *see* S.S.R. 96-2p (ALJ's analysis "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight").  An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record.  20 C.F.R. § 404.1527(d)(1), (d)(3).

---

[4] Engebrecht also claims that the ALJ erred by "fail[ing] to note that treating psychologist Dr. Nicholson also submitted opinions regarding [Engebrecht]'s inability to work." [12 at 13].  The only opinions of record from Dr. Nicholson, however, are the letters that he co-signed with Ms. Hastings (Tr. 280-83, 303); while the ALJ, in discussing these letters, referenced only Ms. Hastings (whom he referred to as "Dr. Hastings") without mentioning Dr. Nicholson by name, he clearly treated them as opinions of an acceptable medical treating source under 20 C.F.R. §§ 404.1513 and 404.1527(c)(2).  (*See* Tr. 30-32).  Accordingly, the court sees no substance to this claim.

As noted above, in assessing Engebrecht's RFC, the ALJ agreed with Dr. Nagarkar and Ms. Hastings that Engebrecht "has significant mental difficulties with work-related activity," and that she "could not return to [her] past job, or a job which involved similar duties." (Tr. 32, 31). The ALJ, however, found that the opinions of Dr. Nagarkar and Ms. Hastings "were inconsistent with the evidence" and worthy of "little relative weight" to the extent that they suggested Engebrecht could not "perform work activities with mental requirements of a far less strenuous nature than those at play in her previous job," as reflected in the RFC. (Tr. 32). In support, the ALJ noted that Engebrecht "was able to perform semi-skilled work for many years despite her mental symptoms (which, Dr. Hastings writes, have persisted since 1987)." (Tr. 32). Furthermore, "[h]er treatment notes, with the exception of discrete periods such as the few days in August 1999 when she sought hospitalization, indicate that she is motivated in working on improving her stress management, anxiety and self-esteem issues, and she is generally described as stable (and often relatively highly-functioning)." (Tr. 31).

The ALJ also observed that Engebrecht has been able to lead "a relatively full and active life" during the relevant time period "with only one serious instance of obvious emotional breakdown"; she "lives alone and handles, with no obvious difficulties, the details of her own life," including "pay[ing] her bills and regularly keep[ing] appointments and lessons"; and she has "remained capable of a wide range of activities outside of work," including reading, keeping a pet cat, and "exercise[ing] regularly, and often with fervor, participating in activities such as rollerblading, walking and other exercise and, during the period under consideration, . . . regular jazzercise classes and weekly horseback riding lessons." (Tr. 30-32). The ALJ acknowledged that, according her treating sources, Engebrecht's "wide range of activities are 'therapeutic' and should not be taken as an indication that [she] is suitable for employment activities," but found

that her "dogged and even enthusiastic pursuit of these activities belie a degree of capability which outstrips the level of functioning portrayed in her treating practitioner's letters," "indicat[ing], for instance, that [her] difficulties with concentration, attention and performance of simple or leisurely tasks are relatively minor." (Tr. 31). Additionally, the ALJ noted, "[t]hough she still does not seem to have close friends outside of her immediate family, she experiences no difficulties with social contacts in her jazzercise classes or horseback riding lessons, and she often leaves her home, unassisted, and operates with no difficulties in public places (with the exception of her episode of exacerbation in August 1999, precipitated by a memory triggered during one of her regular summer trips to a local water park)." (Tr. 31).

Engebrecht raises numerous challenges to this analysis, none of which this court finds persuasive. First, Engebrecht stresses that Dr. Nagarkar, Dr. Nicholson, and Ms. Hastings "consistently maintained th[e] opinion [that Engebrecht is permanently disabled] through the ALJ hearing, providing unequivocal support for the finding that [she] was disabled prior to her . . . date last insured" [12 at 16]; the ALJ, however, was not required to give any special weight to this aspect of their opinions. *See, e.g.*, *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010); 20 C.F.R. § 404.1527(d)(1), (d)(3). What the ALJ was required to do—and what he did—was determine whether these opinions were entitled to controlling weight and, if not, identify what weight they merited and provide "good reasons" in support. Here, while the ALJ agreed with Engebrecht's treating sources that her conditions precluded her from performing her prior job or others like it, he found their opinions that she was incapable of any significant employment inconsistent with substantial record evidence—namely, her ability to work with these same conditions for a number of years, her treatment notes, and her daily activities. Accordingly, he afforded these opinions "little relative weight" in that regard. (Tr. 32). The

court sees no error in this analysis.

Engebrecht contends "[t]here is no record support for the conclusion . . . that [her] therapeutic, recreational activities somehow contradict the opinions of [her] treating physicians or otherwise indicate an ability to engage in competitive employment." [12 at 19]. Engebrecht stresses that her treating sources considered these activities in forming their opinions that she could not work, and that "[t]here is a substantial difference between activities of daily living and activities of full-time work." [12 at 19-20]. The ALJ's assessment, however, does not suggest otherwise; rather, he acknowledged her treating sources' opinions as to her activities, but found that the nature and extent of her participation in them—e.g., in managing her affairs, keeping appointments, operating independently and with others, maintaining concentration and attention, and performing simple tasks—was inconsistent with the limitations proposed by those treating sources and that, taken with other evidence of record, supported her ability to perform a certain level of work. (Tr. 31). It was proper for the ALJ to inform his assessment of Engebrecht and her treating source's opinions in this fashion. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); 20 C.F.R. § 404.1529(a) & (c)(3)(i) (listing "[y]our daily activities" as among the "[f]actors relevant to your symptoms" and how they "affect your ability to work"); *see also, e.g.*, *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (ALJ properly considered claimant's daily activities as among the "good reasons" for discounting treating source's opinion); *Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 342 (6th Cir. 2008) (same).

According to Engebrecht, "[t]he characterizations in the ALJ Decision that [she] 'exercises regularly and often with fervor' and the reference to '[her] dogged and even enthusiastic pursuit of these activities' are cut out of the whole cloth." [12 at 20 (citation

34

omitted)].  Her treatment notes, however, are replete with descriptions of Engebrecht's regular participation in and enjoyment of activities such as rollerblading, walking, biking, jazzercise classes, and weekly horseback riding lessons throughout the relevant time period (Tr. 257, 266, 310-33, 351-57); indeed, at one point Engebrecht herself agreed with a nurse's assessment that she "exercises excessively" (Tr. 266).  This substantial evidence undermines Dr. Nagarkar's suggestion, in his October 27, 2009 letter, that Engebrecht's participation in these activities "[o]n most days . . . is marginal" (Tr. 441), and provides ample support for the ALJ's characterization of them.  Similarly, Engebrecht's reliance on *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), is misplaced.  Engebrecht notes that the Sixth Circuit in *Cole* found "that the ALJ's findings as to Plaintiff's activities of daily living established an inadequate basis for declining to give controlling weight to the treating source's assessment of work limitations."  [12 at 21].  The court reached this conclusion, however, because the ALJ's recitation of the claimant's daily activities was inconsistent with the record, and "the ALJ's focus on the claimant's ability to do certain activities in discounting the treating source's opinion does not constitute 'good reasons' for doing so when the claimant's testimony and other record evidence contradict the ALJ's finding."  *Cole*, 661 F.3d at 938-39.  As discussed above, no such contradiction is present here.

Engebrecht also contends that the ALJ erred by relying on her "relatively healthy rapport with her treating sources" (Tr. 28), her "attentive, engaged and cooperative" behavior at the hearing (Tr. 28), and the reports of consulting state agency psychologist Dr. Marshall (Tr. 29), to reject her treating sources' opinions.  [12 at 22-24].  The ALJ, however, did not point to this evidence in explaining the weight he afforded those opinions, but only in his Step Three determination of whether Engebrecht's impairments met or medically equaled a listed impairment.  Furthermore, the court sees no error in the ALJ's treatment of this evidence.  First,

the ALJ did not, as Engebrecht contends, rely on her behavior with her treating sources to "counteract" his finding that she "experienced more significant problems with social interaction" (Tr. 27), nor did he suggest that "seeking treatment for a disabling condition is evidence of lack of disability." [12 at 23]. Rather, the ALJ considered how Engebrecht comported herself with her treating sources, along with other factors, in assessing the extent of her difficulties with social interaction. (Tr. 27-28). The ALJ likewise factored Engebrecht's behavior at the hearing into this assessment (*id.*), which Engebrecht concedes he could do. [12 at 24]; *see, e.g.*, *Fletcher v. Astrue*, No. 10-0109, 2012 WL 769490, at *19 (M.D. Tenn. Mar. 7, 2012) (ALJ properly considered claimant's appearance at hearing as one of many factors in assessing claimant's complaints of pain), *adopted by* 2012 WL 1044490 (M.D. Tenn. Mar. 28, 2012). This consideration was made particularly relevant in light of Engebrecht's testimony that she experienced anxiety in connection with appearing at such a hearing. (Tr. 62).

Nor did the ALJ, as Engebrecht suggests, "decline to give [her treating sources'] medical opinion[s] less than controlling weight simply because [Dr. Marshall] reached a different conclusion." [12 at 23 (citing *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009)]. Rather, as detailed above, the ALJ gave specific reasons for discounting those opinions, and did not identify Dr. Marshall's reports as a reason—and certainly not the sole reason—for doing so. *See, e.g.*, *Welk v. Comm'r of Soc. Sec.*, No. 09-885, 2010 WL 4117359, at *7-8 (W.D. Mich. Oct. 1, 2010) (distinguishing *Hensley* on that basis), *adopted by* 2010 WL 4115401 (W.D. Mich. Oct. 19, 2010). Furthermore, the ALJ's assessment of Dr. Marshall's reports does not suggest that he afforded them undue weight in his analysis. Rather, the ALJ properly measured Dr. Marshall's findings against the evidence of record and concluded that, while he agreed with the finding that Engebrecht had moderate difficulties with maintaining concentration, persistence and pace, he

36

would not credit the finding that her difficulties with social interaction were only mild. (Tr. 29). *See* S.S.R. 96-6p ("[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . . ."); *see also Helm*, 405 F. App'x at 1002 ("[T]he ALJ was not required to give relatively less weight to the agency source opinions simply because they were contrary to the opinion of [a treating source].").

In sum, the court sees no error in the ALJ's analysis of Engebrecht's treating source opinions. The ALJ made clear the weight he was affording these opinions and provided "good reasons" that were "sufficiently specific" and "supported by the evidence in the case record." 20 C.F.R. § 404.1527(c)(2); S.S.R. 96-2p. Nor does the court see any error in the ALJ's treatment of the evidence discussed above; to the contrary, the court finds that this substantial evidence was properly considered and supports the ALJ's conclusion that Engebrecht is capable of substantial gainful employment consistent with the limitations set forth in the RFC.

### 3.   *The ALJ's Analysis Adequately Accounts for Dr. Plummer's Opinion*

Lastly, Engebrecht challenges the ALJ's treatment of Dr. Plummer's 1998 consultative examination report. [12 at 24-27]. As Engebrecht acknowledges, the ALJ referenced this examination at various points throughout his decision: namely, he relied upon it in determining that Engebrecht possessed the "severe" impairments of borderline intellectual functioning and personality disorder with avoidant features (Tr. 26), and in concluding that Engebrecht's difficulties with social interaction and with maintaining concentration, persistence, and pace, were moderate (Tr. 28). Engebrecht contends, however, that the ALJ erred by not incorporating into the RFC the "significant limitations" suggested by Dr. Plummer—namely, an "inability to perform work within time limits, an inability to accept criticism, the need for special handling by

37

supervisors and coworkers, and problems with responding appropriately to conventional behavior." [12 at 26]. According to Engebrecht, "[s]ince the ALJ Decision failed to state any reason for not giving weight to the opinions of Dr. Plummer and since the ALJ Decision does give weight to Dr. Plummer's finding of an IQ of 75, there is no basis for the ALJ Decision's failure to adopt the[se] limitations." [12 at 26].

As Engebrecht notes, however, Dr. Plummer's "opinions are consistent with the opinions of" Engebrecht's treating sources [12 at 26], and the ALJ discussed at length to what extent he was crediting those opinions in his RFC assessment, and the substantial evidence in support. Accordingly, to the extent the ALJ erred by failing to specifically mention Dr. Plummer or his findings in that assessment, the court finds that any such error was harmless. *See, e.g.*, *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467-69 (6th Cir. 2004).

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Engebrecht's Motion for Summary Judgment [12] be DENIED, the Commissioner's Motion [15] be GRANTED, and this case be AFFIRMED.

Dated: May 6, 2013                          s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 6, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager